IN THE CIRCUIT COURT OF THE 18th JUDICIAL CIRCUIT IN AND FOR BREVARD COUNTY, FLORIDA

**CASE NO:**

JAMES JENSEN,

    Plaintiff,

vs.

THE BLOOM FIRM, PC, and
ARICK FUDALI, individually,

    Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, JAMES JENSEN ("JENSEN"), by and through his undersigned attorneys, hereby sues the Defendants, THE BLOOM FIRM, PC ("BLOOM") and ARICK FUDALI ("FUDALI"), and alleges the following:

### PARTIES

1.    Plaintiff, Jensen, resides at 6655 South Tropical Trail, Merritt Island, Florida and is a resident of Brevard County, Florida.

2.    Defendant, Bloom, is a California corporation handling legal matters within the State of Florida.

3.    Defendant, Fudali, is a Florida licensed attorney, who resides in New York, and handles legal matters within the State of Florida.

### JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this case because it is an action for damages in excess of $50,000.00.

1

5. Plaintiff, Jensen, is a resident of Brevard County, Florida and thus this Court has subject matter jurisdiction.

6. This Court has personal jurisdiction over Fudali because, among other reasons, Fudali is a licensed Florida attorney and engaged in substantial and not isolated legal business activity within Brevard County, Florida, including, but not limited to, defaming Jensen in Brevard County, Florida.

7. This Court has jurisdiction over Bloom because the actions taken by Fudali and other employees of Bloom, including, but not limited to, defaming Jensen in Brevard County, Florida, were conducted while employees at Bloom.

8. This Court has jurisdiction over Bloom because they advertise on their website that "our attorneys are admitted to practice law in California, New York and Florida. We handle cases nationwide."

9. Venue is proper in Brevard County, Florida, as the conduct at issue took place in Brevard County, Florida.

## FACTS

10. This case originates from a long-term personal, entirely consensual relationship Jensen had with Robin Barth ("Barth").

11. In August of 2012, Jensen met Barth in Ocean City, Maryland.

12. At the time, Barth was working as a school nurse in Washington D.C. and lived in a home that she owned jointly with her 3rd husband at the time. Barth had been divorced twice, with four sons (two from each previous marriage).

2

13. Jensen was previously married, but divorced in 2003 without children. From 2012 until early 2017, Jensen and Barth traveled between Washington D.C. and Florida, primarily in Brevard County, in part to spend time with one another.

14. Jensen was, and remains, an entrepreneur after founding Satcom Direct, Inc. ("Satcom"). At all times material hereto, Satcom's headquarters were located in Brevard County, Florida, and Satcom employed a significant number of employees.

15. Jensen has maintained his primary residence in Brevard County continuously and uninterrupted since at least 1999.

16. After her youngest son went to boarding school in Salisbury, Connecticut in 2017, Barth moved from Washington, D.C. to Brevard County, Florida to live with Jensen at his Merritt Island residence.

17. During their relationship, Jensen's primary residence was in Merritt Island, Florida, and Jensen traveled with and without Barth, for vacation and work throughout the span of the parties' relationship.

18. In or about late July 2020, Jensen proposed to Barth, but they did not set a date to get married and they never married.

19. After their engagement, on September 19, 2020, Jensen and Barth voluntarily signed a "Joint Affidavit and Notice of No Agreement to Common Law Marriage" attesting that they were not married and have never held themselves out as being married.

20. The Joint Affidavit and Notice of No Agreement to Common Law Marriage provides:

    a. We, the undersigned, being of lawful age, each of our own account and together, attest to the following facts and provide notice of the following:

    i. Neither of the undersigned have entered, or agreed to enter, into a common law marriage with the other undersigned. No actions, conduct or statements, in the past or future, by either undersigned should be construed as agreement or consent to enter into a common law marriage to the other undersigned.

    ii. Although the undersigned have lived together, and continue to live together at the present time, the undersigned have never professed, agreed, deported, or declared themselves to be husband and wife, and have never held themselves out to the community as being married, as required by MT Code§ 26-1-602(30) (2019).

    iii. If in the future the undersigned agree to be married to one another, the undersigned will formalize their marriage via a ceremony and the recording of the documentation required by the state in which the undersigned are married.

21. The Joint Affidavit and Notice of No Agreement to Common Law Marriage was signed by both Jensen and Barth in Florida and was attested by a Florida Notary Public on September 19, 2020, in Brevard County, Florida.

22. Jensen and Barth held themselves out as engaged, but not married. Barth acknowledged the lack of any marital status on her own legal documents, including tax returns that she filed separately and as a single person. Barth acknowledged that her friends and acquaintances knew that Jensen and Barth were not married; she asked Jensen on multiple occasions for an engagement party to celebrate the announcement of their engagement to be married. Jensen asked her to plan the party, but she never did. Jensen's and Barth's relationship had been and remained rocky, with disputes frequently centering on the behavior of her sons.

23. In August 2018 and again in March 2022, Jensen completed a Last Will and Testament in Florida that stated Jensen was not married.

24. Despite intense professional couples and individual relationship counseling over a period of months during 2022, Jensen and Barth's relationship

4

continued to deteriorate. Finally, Jensen ended his engagement and relationship with Barth on or about October 11, 2022.

25. On or about October 14, 2022, Barth emailed Jensen asking him to reconsider their breakup and threatening to engage a lawyer if he did not. Barth stated:

   a. "I feel your sadness, I feel it with love and devotion to you and wanted you to feel that in your heart;"
   b. "Since the day we met, I have always felt a strong bond and love for you. I have never wanted or tried to distance myself from you, not one day;"
   c. "Your text message to end our relationship and terminate me has left me heartbroken and sickened. I am alone and lost without my best friend, confidant, and partner in life to guide me. I am faced with many difficult decisions and will now need to turn to others for guidance;"
   d. "In order for me to move forward with what you have put in motion, I will need to sell the things you have given me to retain legal representation, including my engagement ring which breaks my heart;"
   e. "Would you like to get together to discuss things? There are many ways we can work together going forward, and not destroy our 10 year relationship. Is this truly the way you want to go? Have you chosen this as our only option? I hope you will reconsider these choices as I sense the point of no return is here."

26. Barth's written statement demonstrated that she willingly was in the relationship and openly pled with Jensen to stay in the relationship as late as October 2022.

27. On October 27, 2022, Barth sent an email to Satcom's Human Resources Department and, for the first and only time, complained about alleged sexual harassment and grooming.

28. In this email, Barth disclosed intimate and private details of her relationship with Jensen.

29. Soon thereafter, Jensen and his legal counsel became aware that Barth had retained legal counsel and was defaming Jensen to mutual friends.

5

30. Barth never complained about any sexual harassment, assault, trafficking, or verbal abuse to anyone including, but not limited to her family, confidants, and/or close personal friends until after it was clear that Jensen would not continue the relationship.

31. The fabricated accusations never arose in any of the individual or group counseling sessions in which Jensen and Barth participated.

32. Many of Barth's friends were interviewed and advised that Barth never complained about any issues during or after the relationship with Jensen.

33. It was only after Jensen ended the relationship that Barth started her campaign to cause Jensen personal pain, embarrassment, and reputational harm in order to extort and blackmail Jensen for money.

34. It was shortly thereafter, on or about November 1, 2022, that counsel for Jensen first received a Letter of Representation from Bloom.

35. Based on information and belief, The Bloom Firm and Arick Fudali's practice is to target well known individuals with accusations of improper behavior, typically under the guise of purported sexual harassment claim, and threaten to make those accusations public. Whether the accusation is true or not does not matter. What matters is making the target pay up.

36. In this case, The Bloom Firm and Fudali set their sights on Plaintiff. Consistent with their typical shakedown practice, the Bloom Firm and Fudali threatened to publicly accuse Plaintiff of having committed serious and violent felony criminal conduct unless Plaintiff paid the Bloom Firm and Fudali's client (and by extension, the Bloom Firm and Fudali) money. In doing so, the Bloom Firm and Fudali forced Plaintiff

to play an extortive game of Russian Roulette. They intentionally sought to induce fear in Plaintiff that he would suffer severe consequences and damage if the Bloom Firm and Fudali pulled the trigger on their threats.

37. On or about November 16, 2022, a demand letter authored by Fudali was sent to Jensen's counsel.

38. Further correspondence was sent directly by Bloom and Fudali to Satcom Direct, Inc.'s headquarters, publishing and making public to all employees at Satcom their unsupported, frivolous, baseless, and damaging accusations against Jensen to Jensen's company, and Jensen's employees.

39. In this correspondence, Fudali makes wild, fabricated, false, and grossly unsupported accusations of sex trafficking, sexual harassment, and retaliation against Jensen.

40. It is apparent from the myriad of false statements, blatant lies, and downright untruths that Fudali and Bloom did not perform any investigation, much less the bare minimum of investigations into Barth's claims and simply decided to drag Jensen through the wringer to extort a legal fee from Jensen.

41. During the following months, Fudali and Bloom orchestrated an intricate offensive to extort money from Jensen.

42. This crusade culminated when Fudali openly called Jensen a rapist and sex trafficker without a shred of evidence to support the claim. These statements were made outside of the mediation process.

43. This scheme was designed by Bloom and Fudali to induce Jensen into paying their client money out of fear these false and outrageous accusations would become widespread and more public.

44. After mediation was not successful, Bloom and Fudali terminated their representation of Barth.

45. It is likely that Bloom and Fudali did not have any intention of representing Barth in litigation at all. As recent cases have shown, Bloom and Fudali's clients routinely admit that Bloom and Fudali have perpetuated blatantly false claims, similar to those in this case.

46. However, the damage to Jensen was done, and it continues to follow him today.

47. Bloom and Fudali have previously and continue to carry out such schemes under the guise of legal advocacy, using their client as a tool to line their own pockets. They concoct phony allegations of horrific conduct, and bank on the reality their targets do not want such disgusting and outrageous allegations made public, even if they are false. They prey on targets knowing most will pay exorbitant amounts of money just to avoid the embarrassment of having repulsive allegations associated with their name. And they rely on the fact their targets will never fight back because doing so would necessarily require their targets to undergo this shame and embarrassment.

48. This was not legitimate legal advocacy. It was nothing more than an old-fashioned shakedown (i.e. extortion).

49. A pattern of racketeering activity by Bloom and Fudali is represented in lawsuits such as Steve Wynn v. Lisa Bloom, et al, and Paul Marciano v. Lisa Bloom, et al.

50. Both exemplar suits outline the exact pattern of activity by Bloom and Fudali wherein they engage in criminal extortion to extract sums of money from successful and wealthy individuals for their own gain.

## COUNT I – CIVIL RICO AGAINST BLOOM

Plaintiff reasserts and realleges paragraphs 1 through 50 as though fully set forth herein.

51. Bloom is an enterprise. Fudali is a member and/or participant of that enterprise.

52. Bloom has engaged in a pattern of racketeering activity, as represented in lawsuits such as Steve Wynn v. Lisa Bloom, et al, and Paul Marciano v. Lisa Bloom, et al.

53. Both exemplar suits outline the exact pattern of activity by Bloom and Fudali wherein they engage in extortion to extract sums of money from successful and wealthy individuals for their own gain without any legal or factual basis for their claims.

54. Bloom's statements, allegations, and publications damaged Jensen personally and reputationally in direct violation of Florida Statute 772. Those damages are ongoing.

55. As a direct result of Bloom's repeated racketeering activity, Jensen has been and continues to be damaged personally and reputationally in an amount to be determined at trial and reasonably believed to be in excess of $50,000.00.

**WHEREFORE**, the Plaintiff, JAMES JENSEN, demands judgment for treble damages against the Defendant, THE BLOOM FIRM, PC, plus interest, attorney's fees, and costs, and requests a trial by jury on all issues so triable.

### COUNT II – CIVIL RICO AGAINST FUDALI

Plaintiff reasserts and realleges paragraphs 1 through 50 as though fully set forth herein.

56. Bloom is an enterprise. Fudali is a member and/or participant in that enterprise.

57. Fudali has engaged in a pattern of racketeering activity, as represented in lawsuits such as Steve Wynn v. Lisa Bloom, et al, and Paul Marciano v. Lisa Bloom, et al.

58. Both exemplar suits outline the exact pattern of activity by Bloom and Fudali wherein they engage in extortion to extract sums of money from successful and wealthy individuals for their own gain without any legal or factual basis for their claims.

59. Fudali's statements, allegations, and publications damaged Jensen personally and reputationally in direct violation of Florida Statute 772. Those damages are ongoing.

60. As a direct result of Fudali and Bloom's repeated racketeering activity, Jensen has been and continues to be damaged personally and reputationally in an amount to be determined at trial and reasonably believed to be in excess of $50,000.00.

**WHEREFORE**, the Plaintiff, JAMES JENSEN, demands judgment for treble damages against the Defendant, ARICK FUDALI, plus interest, attorney's fees, and costs, and requests a trial by jury on all issues so triable.

**DATED** this 15th day of September 2025.

        **CRITTON, LUTTIER & COLEMAN, LLP**
        *Counsel for Plaintiff*
        303 Banyan Blvd., Suite 400
        West Palm Beach, FL 33401
        (561) 842-2820 – Phone
        (561) 844-6929 – Fax
        gcoleman@lawclc.com
        scohen@lawclc.com
        dburchers@lawclc.com
        cwoodward@lawclc.com

By /s/ *Gregory W. Coleman*
    **Gregory W. Coleman, Esq.**
    Florida Bar No.
    **Samuel S. Cohen, Esq.**
    Florida Bar No. 105812

11